Teresa SEUFERT, Plaintiff,

v.

MERCK SHARP & DOHME
CORP., et al.,

Lara v. Merck Sharpe & Dohme
Corp., et al., (13cv2928)

McDaniel v. Merck Sharpe & Dohme
Corp., et al., (13cv3191)

Gaines v. Amylin Pharmaceuticals,
LLC, et al., (14cv0056)

Marble v. Merck Sharpe & Dohme
Corp., et al., (14cv0611)

Stovall v. Amylin Pharmaceuticals,
LLC, et al., (14cv1612)

Heindl v. Merck & Co., Inc.,
et al., (14cv1973)

Blazer v. Amylin Pharmaceuticals,
LLC, et al., (15cv1149)

Gisbon v. Bristol-Myers Squibb
Co., et al., (15cv1340)

Deihl v. Merck Sharpe & Dohme
Corp., et al., (15cv1435)

Copeland v. Bristol-Meyers Squibb
Co., et al., (15cv1884)

Mathews v. Merck Sharp & Dohme
Corp. et al., (15cv2190),
Defendants.

Case No.: 13cv2169 AJB (MDD)
Seufert: 13cv2169
Lara: 13cv2928
McDaniel: 13cv3191
Gaines: 14cv0056
Marble: 14cv0611
Stovall: 14cv1612
Heindl: 14cv1973
Blazer: 15cv1149
Gibson: 15cv1340
Deihl: 15cv1435
Copeland: 15cv1884
Matthews: 15cv2190

Elosegui: 15cv198

United States District Court,
S.D. California.

Signed 05/11/2016

Nicholas Joseph Drakulich, Robert J. Drakulich, The Drakulich Firm APLC, San Diego, CA, for Plaintiff.

Donald F. Zimmer, Jr., King & Spalding LLP, San Francisco, CA, Cameron J. Hoyler, King and Spalding LLP, Los Angeles, CA, for Defendants.

Donald F. Zimmer, Jr., King & Spalding LLP, San Francisco, CA, Cameron J. Hoyler, King and Spalding LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Hon. Anthony J. Battaglia, United States District Judge

### I. INTRODUCTION

On February 27, 2014, the FDA published the following in the *New England Journal of Medicine*:

> With approximately 25.8 million diabetic patients in the United States and 33 million in the European Union alone, the growing prevalence of diabetes worldwide poses a major public health challenge. Both the FDA and the European Medicines Agency are committed to en-

suring the safety of the drugs marketed for the treatment of diabetes, and post-marketing reports of pancreatitis and pancreatic cancer in patients taking certain antidiabetic medications have been of concern to both agencies.... Within the past year, the FDA and the EMA independently undertook comprehensive evaluations of a safety signal arising from postmarketing reports of pancreatitis and pancreatic cancer in patients using incretin-based drugs. These investigations, now complete, included examination of data from a 2013 research report revealing a possible pancreatic safety signal .... Thus, the FDA and the EMA have explored multiple streams of data pertaining to a pancreatic safety signal associated with incretin-based drugs. Both agencies agree that a causal association between incretin-based drugs and pancreatitis and pancreatic cancer as expressed recently in the scientific literature and the media are inconsistent with the current data .... The FDA and the EMA believe that the current knowledge is adequately reflected in the product information and labeling.[1]

The publication, titled "Pancreatic Safety of Incretin-Based Drugs—FDA and EMA[2] Assessment," was prompted by claims that incretin mimetics commonly used to treat type 2 diabetes cause or increase the risk of pancreatic cancer. Plaintiffs raise the same claims in this litigation, alleging Defendants failed to warn of pancreatic cancer risk in product labeling. However, in addition to the FDA's published assessment of pancreatic safety, the FDA has examined incretin mimetics and pancreatic cancer risk on several occasions. Following each review, the FDA has concluded that evidence of a causal relationship between incretin mimetics and pancreatic cancer is indeterminate, unsupported by current data, and inconclusive. In light of these findings, clear evidence exists that the FDA would have rejected a reference to pancreatic cancer in incretin mimetic labeling. Thus, it would have been impossible for Defendants to provide the warning Plaintiffs seek, and Plaintiffs' claims are preempted under *Wyeth v. Levine*, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

## II. BACKGROUND

Before the Court is defendants AstraZeneca Pharmaceuticals LP and Bristol-Myers Squibb Company's ("Defendants") motion for summary judgment. (Doc. No. 119.) Plaintiffs[3] are individuals who consumed the prescription drugs Onglyza and or Kombiglyze XR ("Kombigylze") for the treatment of type 2 diabetes.[4] Defendants currently or formerly marketed the drugs, which are both dipeptidyl peptidase-4 (DPP-4) inhibitors approved by the FDA for the treatment of type 2 diabetes.

Plaintiffs allege Defendants failed to warn that Onglyza and Kombiglyze cause or create an increased risk of pancreatic

---

1. Doc. No. 119-3 at 2–5.

2. "EMA" refers to the European Medicines Agency.

3. On October 3, 2014, the Court consolidated all claims against Defendants under the lead case *Seufert*, Case No. 13cv2169. (*See* Doc. No. 61.) Although Teresa Seufert is the lead plaintiff, the instant motion affects the rights of several other plaintiffs whose cases the Court consolidated under *Seufert*.

4. All cases consolidated under *Seufert* involve the prescription drug Onglyza. Defendants' motion for summary judgment also pertains to Case No. 15cv198, *Elosegui v. Bristol-Myers Squibb Company*, one of two cases filed in this District involving Kombigylze. The other case involving Kombiglyze, *Copeland v. Bristol-Meyers Squibb Co.*, (Case No. 15cv1884) involved concurrent use Onglyza and Kombiglyze.

cancer. Defendants assert that Plaintiffs' failure-to-warn claims are conflict preempted because it would be impossible to reference pancreatic cancer in drug labeling and comply with federal regulations. Defendants moved to dismiss Plaintiffs' claims as preempted in April 2014. (Doc. No. 34.) The Court denied the motion, finding conflict preemption appropriately analyzed after discovery. (Doc. No. 51.) In February 2016, pursuant to a jointly agreed upon briefing scheduling, Defendants moved for summary judgment. Plaintiffs filed an opposition on March 10, 2016, (Doc. No. 125), and Defendants filed a reply on April 1, 2016, (Doc. No. 126). The Court heard oral argument on April 18, 2016. (*See* Doc. No. 130.)

Although the parties contest the significance of the following events, the following facts are undisputed. Ongylza obtained FDA approval on July 31, 2009, and Kombiglyze obtained FDA approval on November 5, 2010. (Doc. Nos. 119-5 at 26–33; 119-5 at 34–39.) Both drugs contain the active ingredient saxagliptin, which regulates insulin production. (Doc. Nos. 119-1 at 12; 119-3 at 3.) The FDA has reviewed DDP-4 inhibitors such as Onglyza and Kombiglyze under the broader class of incretin mimetics or incretin-based therapies. (Doc. No. 119-3 at 2–3); (*see also* Doc. No. 119-5 at 61) ("Drugs in the incretin mimetic class include exenatide (Byetta, Bydureon), liraglutide (Victoza), sitagliptin (Januvia, Janumet, Janumet XR, Juvisync, saxagliptin (Onglyza, Kombiglyze XR), alogliptin (Nesina, Kazano, Oseni) and linagliptin (Tradjenta, Jentadueto).").[5]

As evident from the record, the FDA first considered the pancreatic safety of incretin mimetics in 2009 when it reviewed adverse event reports[6] of pancreatic cancer associated with the use of incretin mimetics. (Doc. No. 119-5 at 48–59.) Following this review, the FDA concluded that a causal association between incretin mimetics and pancreatic cancer was indeterminate. (*Id.* at 56) ("Pancreatic cancer is one of the most frequent cancers to appear in spontaneous adverse event reporting for this therapeutic class. However, a causal association between exposure to one of these agents and pancreatic cancer is indeterminate at this time."). The FDA did not make any labeling recommendations regarding pancreatic cancer following this review. (*Id.*)

In April 2012, the FDA received a citizen petition[7] requesting the FDA withdraw an incretin mimetic called Victoza from the market. (Doc. No. 119-4 at 2.) Along with health implications not relevant to this litigation, the citizen petition cited adverse event data as suggesting an increased risk of pancreatic cancer in pa-

---

**5.** At oral argument, Plaintiffs appeared to challenge whether the FDA has treated all incretin mimetics the same regardless of the active ingredient or the mechanism of operation, *i.e.* whether the drug is a DPP-4 inhibitor or a glucagon-like peptide 1 (GLP-1) receptor agonist. (*See* Doc. No. 130 at 4.) The record does not support a distinction on either grounds. The FDA has consistently referred to all incretin-based therapies collectively, and the parties have done the same. (*See generally* Doc. Nos. 119, 125, 126); (*see also* Doc. No. 119-3 at 3) (making no distinction between data specific to active ingredient or mechanism of action); (Doc. No. 119-5 at 65) (noting GLP-1 based therapeutics includes DPP4 inhibitors and GLP-1 analogues). Accordingly, the Court properly considers the FDA's review of all incretin mimetics in evaluating whether the FDA would have rejected a labeling change to Onglyza or Kombiglyze.

**6.** Federal regulations define an adverse event as "any untoward medical event associated with the use of a drug in humans, whether or not considered drug-related." 21 C.F.R. § 312.32(a).

**7.** A citizen petition is a procedural method by which an individual citizen, group, or entity may request that the FDA change or strengthen drug labeling. *See* 21 C.F.R. § 10.30.

tients taking Victoza. (*Id.* at 27) ("The Petition states that Victoza increases the risk of pancreatic cancer and cites [Adverse Event Reporting System] data to support this finding."). Before responding to the citizen petition, the FDA issued a drug safety communication in March 2013 regarding pancreatic cancer risk and incretin mimetics. (Doc. No. 119-5 at 61) ("FDA Drug Safety Communication: FDA investigating reports of possible increased risk of pancreatitis and pre-cancerous findings of the pancreas from incretin mimetic drugs for type 2 diabetes"). The safety communication was prompted by findings from academic researchers suggesting an increased risk of pre-cancerous cellular changes in type 2 diabetic patients taking incretin mimetics. (*Id.*) The FDA vowed to obtain and evaluate available data, and communicate its conclusions and recommendations when its review was complete or there was additional information to report. (*Id.*) The FDA also stated that it had not reached a new conclusion regarding whether incretin mimetics cause pancreatic cancer, and advised health care professionals to continue following the prescribing recommendations in drug labeling. (*Id.*)

In June of the same year, the FDA participated in the National Institute of Diabetes and Digestive and Kidney Diseases and National Cancer Institute's Workshop on Pancreatitis-Diabetes-Pancreatic Cancer. (*Id.* at 65–66; 69–70.) An FDA supervisory toxicologist at the workshop commented that incretin-based drugs were not associated with "overt pancreatic toxicity or pancreatic neoplasms ... that would indicate a risk to human safety." (*Id.* at 65.) The FDA also acknowledged that postmarketing pancreatic toxicology studies provided by various incretin mimetic manufacturers did not "definitively demon-

strate[ ] a treatment-related adverse effect on exocrine histology or proliferation." (*Id.*)

In February 2014, the FDA published its assessment of pancreatic safety in the *New England Journal of Medicine* ("Assessment"). (Doc. No. 119-3 at 2–5.) Four FDA officials and members of the European Medicines Agency authored the Assessment, which followed an independent and comprehensive review of pancreatic cancer risk. (*Id.* at 2.) In the Assessment, the FDA concluded that claims asserting a causal association between incretin mimetics and pancreatic cancer was "inconsistent with the current data" and that current knowledge was "adequately reflected in product information or labeling." (*Id.* at 4.)[8]

In March 2014, the FDA formally responded to the 2012 Victoza citizen petition, and declined to withdraw Victoza from the market. (Doc. No. 119-4 at 2–38.) With respect to pancreatic cancer risk, the FDA concluded that "any suspicion of a causal association between exposure to Victoza and pancreatic cancer is indeterminate at this time." (*Id.* at 27.) The FDA made no pancreatic cancer labeling recommendations in rejecting the citizen petition. (*Id.*) (noting there was "no new evidence regarding the risk of pancreatic carcinoma in association with the use of Victoza that would support any changes to the current approved labeling").

In September 2014, the FDA again reviewed pancreatic safety concerns related to an incretin mimetic marketed as Saxenda. As part of a briefing document regarding Saxenda, the FDA acknowledged that pancreatic cancer had been "hypothesized but not proven" as a risk associated with incretin mimetics, and that studies had

---

**8.** The Assessment was updated with non-substantive information on June 5, 2014. (*Id.* at 6.)

been "inconclusive in evaluating the risk of pancreatic cancer with incretin mimetic use." (*Id.* at 103.) The document also cited the Assessment, noting the FDA had "explored multiple data streams to evaluate pancreatic toxicity as a potential drug safety signal, which to date, do not support pancreatic cancer as an incretin mimetic-mediated event." (*Id.*)

Most recently, the FDA has approved other incretin-based therapies without any reference to pancreatic cancer in product labeling. (*See, e.g.,* Doc. Nos. 119-4 at 40–43; 119-4 at 55–67; 119-4 at 69–82.) The labeling of incretin mimetics, including Onglyza and Kombiglyze, does not reference pancreatic cancer. Defendants, as well as other incretin mimetic manufacturers, have not attempted to reference pancreatic cancer in product labeling, and the FDA has never precluded a manufacturer from referencing pancreatic cancer in incretin mimetic labeling.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment permits a court to enter judgment on factually unsupported claims, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and may also be used in the area of affirmative defenses. *Dam v. Gen'l Elec. Co.,* 265 F.2d 612, 614 (9th Cir.1958). Granting summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*[9]

Under the Supremacy Clause, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000); *see also Oneok, Inc. v. Learjet, Inc.,* ── U.S. ──, 135 S.Ct. 1591, 1594–95, 191 L.Ed.2d 511 (2015). A preemption analysis begins with two governing principles. First, congressional intent is the "ultimate touchstone." *Levine,* 555 U.S. at 565, 129 S.Ct. 1187. Second, in a field the States have traditionally occupied, there is a presumption against preemption based on the notion that "Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Preemption occurs in three forms: (1) express preemption; (2) field preemption; and (3) conflict preemption. *Ting v. AT & T,* 319 F.3d 1126, 1135 (9th Cir.2003). "Express preemption exists where Congress enacts an explicit statutory command that state law be displaced." *Id.* Field and conflict preemption are forms of implied preemption. Field preemption occurs when federal regulation is sufficiently comprehensive that it leaves no room for supplementary state regulation. *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Conflict preemption occurs when: (1) "compliance with both federal and state regulations is a

---

**9.** Defendants argue Plaintiffs' opposition seeks reconsideration of *In re Incretin–Based Therapies Products Liability Litigation,* 142 F.Supp.3d 1108 (S.D.Cal.2015), and the Court's October 6, 2014 order denying MDL Plaintiffs' motion to compel discovery, (Case No. 13md2452, Doc. No. 705). The Court does not construe Plaintiffs' opposition as a motion for reconsideration, and therefore considers Defendants' motion under Rule 56 and Supreme Court precedent governing conflict preemption in the prescription drug context.

physical impossibility," or (2) "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 713, 105 S.Ct. 2371 (internal citation and quotation marks omitted).

Federal statute does not expressly preempt Plaintiffs' failure-to-warn claims, and prescription drug regulation is a field the States have traditionally occupied. *See Reigel v. Medtronic, Inc.*, 552 U.S. 312, 327, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008) (noting Congress could have expressly preempted claims regarding pharmaceutical drugs, but chose not to); *Lefaivre v. KV Pharm., Co.*, 636 F.3d 935, 941 (8th Cir. 2011) (citing *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) ("[T]he FDA [has] long maintained that state law offers an additional, and important, layer of consumer protection that complements FDA regulation.")).

Defendants do not assert Plaintiffs' claims create an obstacle to the full purposes and objectives of Congress, and thus obstacle preemption is not at issue. As such, the Court's inquiry will focus on whether concurrent compliance with federal regulations and state tort law is impossible.

## IV. DISCUSSION

■ To resolve the instant motion, the Court must apply the standard set forth in *Wyeth v. Levine*, which requires a conflict preemption proponent to establish by "clear evidence" that the FDA would have rejected a labeling change specific to a plaintiff's claims. *Levine*, 555 U.S. at 571, 129 S.Ct. 1187 ("But absent clear evidence that the FDA would not have approved a change to Phenergan's label, we will not

conclude that it was impossible for Wyeth to comply with both federal and state requirements."). Despite providing the relevant standard, neither *Levine*, nor controlling Ninth Circuit authority define what constitutes clear evidence and markedly few cases have found the clear evidence standard satisfied.[10] In opposition to summary judgment, Plaintiffs propose a definition of clear evidence—manufacturer submission of a proposed labeling change and express rejection of that change by the FDA. (Doc. No. 125 at 9.) According to Plaintiffs, because Defendants have not submitted a pancreatic cancer labeling change to the FDA, or been expressly precluded from doing so by the FDA, conflict preemption fails as an affirmative defense. However, as detailed below, *Levine* does not premise clear evidence on manufacturer submission of a proposed warning to the FDA.

As an initial matter, the plain language of *Levine* does not support Plaintiffs' contention that manufacturer submission and express rejection of a proposed warning is required to satisfy the clear evidence standard. The relevant inquiry in each conflict preemption case since *Levine* is stated as whether the FDA would have rejected a proposed labeling change, not whether the FDA did in fact issue an explicit rejection. *See, e.g., Gaeta v. Perrigo Pharm. Co.*, 630 F.3d 1225 1237 (9th Cir.2011) *cert. granted, judgment vacated sub nom. L. Perrigo Co. v. Gaeta,* — U.S. —, 132 S.Ct. 497, 181 L.Ed.2d 343 (2011); *Koho v. Forest Labs., Inc.*, 17 F.Supp.3d 1109, 1116 (W.D.Wash. 2014); *Dorsett v. Sandoz, Inc.*, 699 F.Supp.2d 1142, 1157 (C.D.Cal.2010). As one court recently stated, conflict preemption requires a court to "weigh the evidence submitted by both sides in an at-

---

10. The Court recently surveyed conflict preemption case law as applied to pharmaceutical drug regulation in *In re Incretin–Based Therapies Products Liability Litigation*, 142

F.Supp.3d at 1115–19. In the interest of efficiency, the Court incorporates that discussion by reference as if set forth fully herein.

tempt to answer the *hypothetical* question posed by *Levine.*" *In re: Zofran (Ondansetron) Products Liab. Litig.*, No. 1:15MD2657, 2016 WL 287056, at *3 (D.Mass. Jan. 22, 2016) (emphasis added). Thus, the test articulated by the Supreme Court necessarily considers instances where a manufacturer has not submitted a labeling change to the FDA.

Additionally, while few cases have found failure-to-warn claims conflict preempted under *Levine,* that does not mandate the same outcome in this case. *Dobbs v. Wyeth Pharm.,* 797 F.Supp.2d 1264, 1270 (W.D.Okla.2011) ("Although those decisions have universally found the manufacturer's evidence inadequate to support conflict preemption, that result is not necessarily dictated here[.]"). Because the clear evidence standard remains undefined, application of *Levine* involves a fact specific inquiry dependent on the particular warning at issue in each case. *Id.*; *see also In re Depakote,* 87 F.Supp.3d 916, 922 (S.D.Ill.2015) ("In *Wyeth,* the Supreme Court does not define clear evidence, so application of the clear evidence standard is necessarily fact specific.") (internal quotation marks omitted). Moreover, a review of case law addressing conflict preemption supports the conclusion that a clear evidence analysis involves more than an inquiry into whether a manufacturer submitted a proposed labeling change to the FDA. Courts in this Circuit and others have considered several factors in assessing conflict preemption, including the regulatory history of the drug or drug class at issue, temporal gaps between FDA action

and accrual of a plaintiff's claims, citizen petition submissions and rejections, available scientific data, and whether the FDA has reviewed the particular harm at issue and the consistency of any resulting conclusions. *See Levine,* 555 U.S. at 572, 129 S.Ct. 1187; *Gaeta,* 630 F.3d at 1237; *Koho,* 17 F.Supp.3d at 1116–19; *Dobbs,* 797 F.Supp.2d at 1272–75; *Mason v. SmithKline Beecham Corp.,* 596 F.3d 387, 395–96 (7th Cir.2010). Thus, manufacturer submission of a proposed labeling change is relevant, but not dispositive, in determining whether a defendant can establish conflict preemption.

Other courts have similarly concluded the clear evidence standard may be satisfied outside of express FDA rejection of a manufacturer proposed labeling change. *See Cerveny v. Aventis, Inc.,* Case No. 2:14cv545, 155 F.Supp.3d 1203, 1213–16, 2016 WL 1065826 at *8–9 (D.Utah, Mar. 16, 2016) ("Courts have universally rejected the notion that *Levine* requires a showing that the manufacturer attempted to apply the warning suggested by the plaintiff but that the labeling was ultimately rejected by the FDA."); *Reckis v. Johnson and Johnson,* 471 Mass. 272, 290 n. 29, 28 N.E.3d 445 (2015) ("The court in *Wyeth* specifically suggested that 'clear evidence' could be established by the FDA's rejection of a drug maker's attempt to give the warning underlying a claim of failure to warn.... That is not to say that the *Wyeth* standard of clear evidence can be satisfied only by the FDA's rejection of a manufacturer's request for an additional warning.").[11] Plaintiffs' position is there-

11. Plaintiffs challenge the Court's reliance on *Reckis* in light of the Supreme Court's recent denial of certiorari. *See Johnson & Johnson v. Reckis,* —— U.S. ——, 136 S.Ct. 896, 193 L.Ed.2d 809 (2016). According to Plaintiffs, the denial constitutes implied approval of a narrow interpretation of *Levine* requiring FDA rejection of a proposed warning. (*See* Doc. No. 125 at 17) (arguing "the Supreme Court was comfortable with *Reckis,* and 'most

courts' interpreting *Levine* narrowly, so that the 'clear evidence' standard could only be met where there had been an 'explicit rejection' "). A denial or grant of certiorari has no precedential authority and does not reflect the Supreme Court's position regarding the merits of a case or a lower court's ruling. *See, e.g., Elgin, Joliet, & E. Ry. Co. v. Gibson,* 355 U.S. 897, 78 S.Ct. 270, 2 L.Ed.2d 193 (1957) ("Al-

fore unsupported by the plain language of *Levine*, and has been rejected by other courts expressly, or through detailed and fact specific conflict preemption analyses. As such, the fact Defendants have not submitted a pancreatic cancer labeling change to the FDA does not preclude a finding that Plaintiffs' claims are conflict preempted.

Plaintiffs also raise a similar argument premised on the distinction between FDA consideration of a risk and FDA consideration of a proposed warning. (*See* Doc. No. 125 at 10–12.) Plaintiffs assert that the FDA's consideration of a risk, when not accompanied by specific warning language addressing that risk, is insufficient to establish conflict preemption. (*Id.*) As support for this position, Plaintiffs contend *Levine* and *Gaeta* both involved FDA consideration of the risk implicated by the plaintiff's claims, but found against preemption because the FDA had not considered and rejected the warnings proposed by the plaintiffs. (*Id.*) Plaintiffs also rely on cases addressing preemption and failure-to-warn claims with antidepressants and suicidality as illustrating the need for the FDA to consider specific warning language in connection with a conflict preemption analysis. (*Id.* at 16–17; Doc. No. 130 at 16–19.)

The cases relied on by Plaintiffs are distinguishable on several grounds. Significantly, in many conflict preemption cases the risk considered by the FDA did not correspond to the safety issue the plaintiff alleged should have been included in product labeling. For example, in *Levine*, the plaintiff argued the defendant should have warned of the risks associated with the

"IV-push" method of administering Phenergan. 555 U.S. at 560, 129 S.Ct. 1187. The record in *Levine*, however, established that the FDA had given no more than passing attention to the risks associated with that specific method of administration. *Id.* at 572, 129 S.Ct. 1187 (noting there was "no evidence in th[e] record that either the FDA or the manufacturer gave more than passing attention to the issue of IV-push versus IV-drip administration") (internal quotation marks omitted). Thus, *Levine* involved not only a specific warning about the method of administration, but also a lack of FDA consideration and action regarding the risk implicated by the plaintiff's claim. *Id.* at 572–73, 129 S.Ct. 1187.

Similarly, in *Gaeta*, the FDA had reviewed the general safety of ibuprofen on several occasions, including evidence that ibuprofen was safe and effective. *Gaeta*, 630 F.3d at 1236–37. There was limited evidence however, that the FDA had considered the risk of hepatotoxicity associated with concurrent use of ibuprofen and other drugs known to cause liver toxicity. *Id.* The Ninth Circuit accordingly concluded there was insufficient evidence that the FDA had considered the specific warning sought by the Gaetas. *Id.* ("Nowhere does Perrigo point to any evidence that the FDA was presented with and actually considered the risk of hepatotoxicity due to concomitant use of ibuprofen and other drugs known to be hepatotoxic, which is the specific warning requested by the Gaetas in this case."). Finding the evidence no more compelling than that in *Levine*, the court concluded the plaintiffs' claims were not preempted. *Id.*

though the Court has definitely decided that a denial of a petition for certiorari carries no legal significance, the bar, in briefs, and lower courts, in their opinions, continue to note such denials by way of reinforcing the authority of cited lower court decisions. It has there-

fore seemed to me appropriate from time to time to emphasize through concrete illustrations that a denial of certiorari does not imply approval of the decision for which review is sought or of its supporting opinion.") (internal citation omitted).

Plaintiffs are correct that in both *Levine* and *Gaeta*, there was a difference between the warning at issue and the safety risk considered by the FDA. The same is not true in this case. The warning sought by Plaintiffs—that incretin mimetics cause or increase the risk of pancreatic cancer—is the same risk the FDA has considered.[12] Further, the FDA inaction apparent in *Levine* is absent from the present record. To the contrary, the FDA has actively investigated pancreatic cancer risk and frequently communicated its findings to the public. *Cf. Levine*, 555 U.S. at 561–62, 129 S.Ct. 1187 (describing FDA inaction in response to defendant's submission of supplemental new drug applications). The FDA's review of pancreatic safety has also included consideration of data supportive of the position Plaintiffs advance in this litigation, namely that incretin mimetics cause or increase the risk of pancreatic cancer. The FDA's review therefore directly corresponded to the claims at issue in this litigation.

Additionally, the warning Plaintiffs seek is distinguishable from those at issue in the line of cases assessing suicide risk and antidepressants. Several cases have considered failure-to-warn claims stemming from the use of antidepressants, specifically those known as SSRI's,[13] and the risk of suicide. None of the cases cited by Plaintiffs involved the initial determination of whether to reference suicide in product labeling. Instead, the FDA had already made the threshold determination to reference suicide risk in drug labeling and information, thus shifting the focus to the specific language used to convey that risk to patients and their families. *See, e.g., Dorsett*, 699 F.Supp.2d at 1146 (alleging the defendant should have provided "a stronger warning regarding the association between fluoxetine and suicidality through

a variety of mediums, including but not limited to labeling, continuing education, symposiums, posters, advertisements"); *Koho*, 17 F.Supp.3d at 1116–17 (alleging the defendant "should have added a warning of increased risk of suicidal thoughts and behaviors early in treatment, including an emphasis on the importance of communicating the risk to family members who would be the first to observe any telltale changes in behavior").

Moreover, many of the warnings at issue in the antidepressant cases were directed at particular patient groups, such as pediatric or young adult patients. *Cf. Mason*, 596 F.3d at 389 (considering a warning of increased suicide risk, especially among young adults), *with Dobbs*, 797 F.Supp.2d at 1265 (addressing suicide warnings directed at adult patients). Because the SSRI cases implicated specific warning language directed at different patient groups, the FDA, and by extension, the courts' analyses of FDA action, parsed specific warning language to compare what the FDA had already considered and what was presently included in product labeling.

The warning at issue in this case is far less specific and is not directed at any particular group of patients taking incretin mimetics. Additionally, product labeling does not currently reference pancreatic cancer, making the initial determination of whether to include pancreatic cancer in product labeling paramount to consideration of specific warning language. As such, it would likely be premature for the FDA to consider specific warning language when neither a manufacturer nor the FDA has determined that pancreatic cancer risk should be included in product labeling.

Plaintiffs also rely on *Reckis v. Johnson & Johnson* for the argument that preemp-

---

**12.** *See* § II, *supra.*

**13.** "SRRI's" are formally known as selective serotonin reuptake inhibitors.

tion cannot be found absent FDA rejection and comment on specific proposed warning language. *Reckis* involved ibuprofen and the risk of Stevens Johnson Syndrome ("SJS") and toxic epidermal necrolysis ("TEN"). 471 Mass. at 273–74, 28 N.E.3d 445. In *Reckis*, the FDA considered a citizen petition requesting an update to product labeling referencing SJS and TEN, both of which are potentially life-threatening conditions that can result from, or be exacerbated by, continued use of ibuprofen. *Id.* at 278–80, 28 N.E.3d 445. The FDA rejected the citizen petition to the extent it requested that product labeling reference SJS and TEN by name, citing consumer unfamiliarity with those terms. *Id.* at 281, 28 N.E.3d 445. However, the FDA agreed that the manufacturer should update product labeling to reflect the severe and potentially life threatening nature of SJS and TEN. *Id.*

The court in *Reckis* concluded that claims asserting the defendant should have warned of SJS or TEN by name were preempted. *Id.* at 290–91, 28 N.E.3d 445. The court's preemption finding was limited, however, noting that it was "anybody's guess" whether the FDA would approve a label referencing a "life threatening" disease or other language that did not raise consumer unfamiliarity concerns. *Id.* at 289, 28 N.E.3d 445 ("Whether the FDA also would consider including a mention of life-threatening diseases, by itself, to be inappropriate and off limits on the [over the counter] label is anybody's guess; certainly the reason specified by the FDA for rejecting use of the disease names—consumer unfamiliarity—does not apply to use of such a phrase.").

Although Plaintiffs argue that it is similarly unknown what the FDA would do with a pancreatic cancer label change, *Reckis* is perhaps the most distinguishable from the facts of this matter. First, as prescription drugs not available for over-the-counter purchase, incretin mimetics do not pose the same consumer familiarity issues present in *Reckis*. This negates, at least in part, the need for the FDA to consider specific warning language to ensure consumer familiarity. Similarly, neither party in this case has asserted that pancreatic cancer is a term patients are unfamiliar with, so as to suggest the FDA would permit a reference to pancreatic cancer risk through different or more specific language. Lastly, in *Reckis*, the FDA agreed that product labeling should reflect the risk of SJS and TEN. Here, the FDA has repeatedly rejected the proposition that incretin mimetic labeling should reflect a risk of pancreatic cancer. Based on these differences, the fact that the FDA has not considered pancreatic cancer risk in the context of a proposed warning does not prevent the Court from finding Plaintiffs' claims conflict preempted.[14]

Having concluded the facts of this case do not preclude preemption as a matter of law, the Court now turns to the evidence offered in support of preemption.

**A. Clear Evidence Exists that the FDA Would Reject a Pancreatic Cancer Reference in Product Labeling**

 Following a thorough review of the record, clear evidence exists that the FDA would have rejected a pancreatic cancer labeling change. The FDA has consistently considered pancreatic cancer risk and con-

---

14. Plaintiffs also rely on *Newman v. McNeil Consumer Healthcare*, Case No. 10cv01541, 2012 WL 39793, at *8 (N.D.Ill. Jan. 9, 2012), for the proposition that the FDA must consider and comment on specific proposed warning language. *Newman*, however, states that consideration of warning language "may be necessary in some instances," but that "the FDA may reject a whole series of warnings without concerning itself with various formulations." (*Id.* at *8, n. 6.) For the reasons set forth above, the FDA did not need to consider specific pancreatic cancer warning language.

cluded evidence of a casual association was indeterminate, and therefore insufficient to support a reference to pancreatic cancer. The most persuasive evidence in support of preemption is the FDA's February 27, 2014, publication in the *New England Journal of Medicine.*[15] In addition to the Assessment, each other time the FDA has reviewed pancreatic cancer risk, the FDA has concluded there was not reasonable evidence of a causal association. (*See* Doc. Nos. 119-3 at 4; 119-4 at 27; 119-4 at 103; 119-5 at 56.)[16] The FDA has also articulated its conclusions in the context of product labeling, each time suggesting no labeling changes or stating that current labeling adequately reflected scientific knowledge regarding pancreatic cancer risk. (Doc. Nos. 119-3 at 4; 119-4 at 27; 119-5 at 56.) The FDA's repeated conclusion that scientific data did not support warning of pancreatic cancer risk coupled with the FDA's statement that product labeling was adequate amounts to clear evidence that the FDA would have rejected a pancreatic cancer labeling change. *See Rheinfrank v. Abbott Labs., Inc.*, 119 F.Supp.3d 749, 766 (S.D.Ohio 2015) ("The Court finds the FDA's February 2006 decision that developmental delay warnings 'should not be incorporated into [Depakote] labeling' and the FDA's 2008 belief that 'the data do not

provide sufficient evidence to support [Depakote] labeling changes at this time' constitute 'clear evidence' that when confronted by the issue in 2003, the FDA would have rejected an attempt to add a developmental delay warning."); *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 873 (7th Cir.2010) (noting "it would be odd to think that McNeil had a legal duty to guarantee against a risk that the FDA thought not worth warning against").

The FDA's failure to act regarding pancreatic cancer risk also weighs in favor of finding Plaintiffs' claims preempted. If the FDA believed scientific data supported a labeling reference to pancreatic cancer, it could have mandated a label change independent to, or concurrently with, any one of its reviews of pancreatic safety. While the FDA's failure to mandate a label change does not establish clear evidence under *Levine*, the FDA's failure to act when presented with data specific to pancreatic cancer risk supports a finding of preemption. *Cf. Gaeta*, 630 F.3d at 1237 ("Nor does Perrigo suggest that it supplied the FDA with any 'evaluation or analysis concerning the specific dangers' posed by such concomitant use, and that the FDA refused to act.") (internal citations omitted).

---

**15.** Plaintiffs argue "the only statement by the FDA through its official channel for drug safety communications" is the 2013 safety communication published on the FDA's website. (*See* Doc. No. 125 at 22–23.) However, FDA officials authored the Assessment, which lacked a disclaimer required when publications are not considered official FDA work, and referenced the safety communication. (*See* Doc. No. 119-5 at 72–73) (discussing requirements for "FDA-assigned" and "non-assigned" publications and speeches). That the FDA chose to publish its conclusion in the *New England Journal of Medicine* instead of through its own website does not weaken the extent of the FDA's review underlying the Assessment, and the FDA's conclusions as articulated therein.

**16.** Plaintiffs argue the FDA's belief regarding a causal association between incretin mimetics and pancreatic cancer is irrelevant for preemption purposes and does not answer the question of whether the FDA would have rejected a Changes-Being-Effected ("CBE") submitted by the manufacturer. (Doc. No. 125 at 22.) However, what the FDA believed and publicly expressed regarding pancreatic cancer risk is the best indicator of what the FDA would have done in response to a manufacturer submitted CBE. The CBE provision permits a manufacturer to make changes prior to obtaining FDA approval. *See* 21 C.F.R. § 314.70(c)(6)

In addition to the factual grounds underlying the Court's conclusion, a clear evidence analysis must account for the regulatory framework governing prescription drug labeling. Any changes to product labeling would have to be supported by "reasonable evidence of a causal association" or "some basis to believe" there is a causal association between a drug and a particular risk. *See* 21 C.F.R. § 201.57(c)(6)(i); (c)(7); § 201.80(e). While both standards fall short of requiring definitive proof of a casual association, *see* 21 C.F.R. § 201.57(c)(6)(i), both demand more than an indeterminate or inconclusive relationship. *See Dobbs*, 797 F.Supp.2d at 1272 ("The FDA has consistently defined reasonable evidence of a causal association as 'when evidence exists on the basis of which experts qualified by scientific training and experience can reasonably conclude that the hazard is associated with the use of the drug.' ") (citing 44 Fed. Reg. 37434, 374634 (June 26, 1979)); *see also Mason*, 596 F.3d at 392 ("It is technically a violation of federal law to propose a CBE that is not based on reasonable evidence.") (citing 18 U.S.C. § 1001).

As the Supreme Court noted in *Levine*, a manufacturer has a duty to make labeling changes when a risk becomes apparent. *Levine*, 555 U.S. at 571, 129 S.Ct. 1187 ("Thus, when the risk of gangrene from IV-push injection of Phenergan became apparent, Wyeth had a duty to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval."). Here, Defendants did not have a duty to submit a pancreatic cancer warning to the FDA because the risk of pancreatic cancer was never readily apparent from available data.[17] A rule to the contrary would encourage prophylactic labeling changes by manufacturers, which, in turn, could inundate the FDA with labeling submissions. This could lead to overwarning consumers and deterring potentially beneficial use of a prescription drug. *See Muzichuck v. Forest Laboratories*, Case No. 1:07cv16, 2015 WL 235226 at n. 2 (N.D.W.V. Jan. 16, 2015) ("Public policy recognizes a danger in 'overwarning' consumers of potential drug-related risks"); *see also Mason*, 596 F.3d at 392; *Robinson*, 615 F.3d at 869; (Doc. No. 125-2 at 9) (FDA guidance regarding communications with the public noting that the agency is "mindful of the potential public health implications of providing emerging drug safety information and are particularly concerned about possible consequences such as inappropriate modification or discontinuation of useful treatment").

Finally, the evidence establishes that if Defendants had submitted a pancreatic cancer labeling change, the FDA would have rejected it. The regulatory standards governing prescription drug labeling are the same whether the FDA is considering data as part of an independent review, in connection with a citizen petition, or in response to a manufacturer submitted CBE. Though Plaintiffs argue the FDA gives deference to submissions made by a manufacturer, the authority relied upon by Plaintiffs does not establish the degree or manner of deference the FDA would afford a manufacturer submission. *See, e.g., Reckis*, 471 Mass. at 289; *Baumgardner v. Wyeth Pharmaceuticals*, 2010 WL 3431671, at *1 (E.D.Pa. Aug. 31, 2010); *Schedin v. Ortho–McNeil–Janssen Pharms., Inc.*, 808 F.Supp.2d 1125, 1133

---

17. Notably, the Oxford English Dictionary defines "apparent" as "manifest to the understanding; evidence, plain, clear, obvious; palpable." *Apparent,* OED Online, Oxford University Press, March 2016, http://www.oed.com/view/Entry/9518?rskey=NUKqsL& result=1&isAdvanced=false#eid The same source defines the term "indeterminate" as "not determined; undetermined." *Indeterminate*, OED Online, Oxford University Press, March 2016, http://www.oed.com/view/Entry/94357?redirectedFrom=indeterminate#eid

(D.Minn.2011). Although Plaintiffs do not have to demonstrate that the FDA's review of pancreatic safety differed from what the agency would have done in response to a manufacturer submitted CBE, (see Doc. No. 125 at 9), the record suggests the FDA's review of pancreatic safety was more comprehensive than that reviewed in connection with a manufacturer submitted labeling change. In evaluating pancreatic cancer risk, the FDA considered data regarding multiple incretin mimetics manufactured by different companies, and had access to data not readily available to individual manufacturers in the highly competitive prescription drug market.

Thus, although the CBE provision is an integral means for a manufacturer to maintain adequate product labeling, a manufacturer must utilize that provision only when a submission is supported by sufficient scientific data. It is a well-settled maxim of jurisprudence that the law does not require idle acts. When considered in the context of federal regulations governing prescription drug labeling, Defendants did not have to submit a pancreatic cancer labeling change to establish conflict preemption. The unprecedented facts of this matter readily establish by clear evidence that the FDA would have rejected a labeling change referencing pancreatic cancer.

Plaintiffs raise two additional arguments in opposition to preemption. First, Plaintiffs cite the FDA's acknowledgement that it has not reached a "final conclusion" regarding pancreatic cancer risk as weighing against preemption. (Id. at 22–24.) According to Plaintiffs, because the FDA has not reached a final conclusion, the Court cannot conclude that the FDA would reject a pancreatic cancer warning if sought by Defendants. However, the Supreme Court has acknowledged that risk information accumulates over time. Levine, 555 U.S. at 569, 129 S.Ct. 1187. Likewise, clinical stud-

ies of incretin mimetics remain ongoing nearly a decade after initial FDA approval. (See, e.g., Doc. Nos. 119-3 at 8–17; 119-4 at 106–14). Thus, the contention that the FDA or a manufacturer would reach a final conclusion regarding the safety of a prescription drug is inconsistent with the CBE provision and a manufacturer's duty to maintain the adequacy of product labeling. Plaintiffs' position also illustrates the incongruity of tort law and science. The law requires a level of decisiveness that is neither required, nor expected, of science. The scientific discoveries of tomorrow may redefine our understanding of the safety and efficacy of prescription drugs. Yet, the Court must adjudicate the issues raised by the present motion without waiting until, if ever, the FDA renders a final decision regarding the pancreatic safety of incretin mimetics. Given the evolving nature of scientific data and medical research, arguments challenging the finality of the FDA's conclusions are not persuasive.

Next, Plaintiffs argue Defendants cannot reconcile the reference to pancreatitis in product labeling with the FDA's conclusion regarding pancreatitis in the Assessment. (Doc. No. 125 at 24–25.) The Assessment addressed concerns regarding pancreatitis and pancreatic cancer and concluded with respect to both that evidence of a causal association as reflected in the media and scientific literature did not reflect scientific data. (Doc. No. 119-3 at 4.) Plaintiffs rely on this language to argue the reference to pancreatitis in product labeling suggests the FDA would approve a reference to pancreatic cancer.

It is evident from the record that although the FDA has referenced pancreatic cancer and pancreatitis together, it has repeatedly differentiated between the two. Indeed, it is easy to reconcile the reference to pancreatitis in product labeling as the record shows a qualitative difference in available data. For example, the Assess-

ment itself addresses the reference to pancreatitis in product labeling stating, "although the totality of the data that have been reviewed provides reassurance, pancreatitis will continue to be considered a risk associated with these drugs until more data are available." (*Id.*) The 2013 safety communication also addressed pancreatitis separately, citing data specific to an increased risk of developing pancreatitis and noting that product labeling warned about the risk of pancreatitis, but that the FDA had not previously communicated about pancreatic cancer risk. (Doc. No. 119-5 at 61.) Additionally, the Victoza citizen petition response separately addressed pancreatic cancer and pancreatitis risk, which included a lengthy discussion of data specific to pancreatitis. (*Cf.* Doc. No. 119-4 at 23–27, *with* Doc. No. 119-4 at 27.)

As noted by defense counsel at the hearing on this motion, pancreatic cancer and pancreatitis are distinct medical entities, a fact undisputed by Plaintiffs. As different medical conditions, pancreatitis and pancreatic cancer also carry significantly different health implications, which could reasonably account for the reference to pancreatitis, but not pancreatic cancer, in product labeling. The fact the FDA has

maintained a reference to pancreatitis in product labeling does not support the conclusion the FDA would permit a reference to pancreatic cancer. For these reasons, the reference to pancreatitis in product labeling does not undermine the Court's conclusion that the FDA would have rejected a pancreatic cancer labeling change.

As detailed above, the record establishes the FDA has reviewed, independently investigated, and commented publicly on the specific issue implicated by Plaintiffs' claims. Accordingly, Defendants have established by clear evidence that the FDA would have rejected a pancreatic cancer labeling change. *See Robinson,* 615 F.3d at 873 ("The FDA decided not to require such a warning ... and a court cannot order a drug company to place on a label a warning if there is 'clear evidence' that the FDA would not approve it.").[18] Although Plaintiffs assert several challenges to the clear evidence offered in support of preemption, the Court finds the arguments and authority presented distinguishable. Plaintiffs have failed to rebut the clear evidence in support of conflict preemption. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary

18. In support of summary judgment, Defendants cite data from emerging clinical trials, including the SAVOR, EXAMINE TECOS, and ELIXA studies. While it is apparent from the Assessment that the FDA considered data from the SAVOR and EXAMINE studies, the same is not true for the TECOS or ELIXA data. As the Court cannot second-guess the FDA's determinations, it also cannot bolster the FDA's conclusions with data the FDA may not have considered. Nonetheless, emerging data is notable, if only for the fact that it suggests an inverse relationship between incretin mimetics and pancreatic cancer as that proffered by Plaintiffs. The EXAMINE clinical trial, dealing with the active ingredient alogliptin, involved 5,380 patients and reported no incidences of pancreatic cancer. (Doc. Nos. 119-3 at 4; 119-4 at 106–114.) SAVOR involved 16,492 patients and resulted in sev-

enteen cases of pancreatic cancer, twelve of which occurred in patients taking a placebo, and five in patients taking saxaglitpin. (Doc. No. 119-3 at 4.) TECOS was similarly sized, with 14,700 patients and twenty-three cases of pancreatic cancer. (Doc. No. 119-5 at 2–12.) Of the twenty-three cases, fourteen cases occurred in patients taking a placebo, and nine occurred in patients taking sitagliptin. (*Id.*) Finally, the ELIXA study involved lixisenatide and 6,000 patients. The study resulted in twelve cases of pancreatic cancer, only three of which occurred in patients taking lixisenatide. (Doc. No. 119-5 at 14–24.) While this data does not factor into the Court's conclusion that Plaintiffs' claims are conflict preempted, the Court notes it as recent data offered by Defendants in support of preemption.

judgment in favor of Defendants is therefore appropriate.

## B. Plaintiffs' Request for Additional Discovery

█ Plaintiffs request the Court permit additional discovery in lieu of entering summary judgment. (Doc. No. 125 at 25.) Plaintiffs seek discovery beyond the February 27, 2014 cutoff date, arguing the date was arbitrary and prejudiced Plaintiffs in their ability to obtain information about the FDA's actions and potential new safety information in Defendants' possession. (*Id.* at 25–26.) Defendants challenge Plaintiffs' request as untimely, inconsistent with previous acknowledgements that discovery is complete, and irrelevant to preemption. (Doc. No. 126 at 10–11.) Defendants note that only one plaintiff in these consolidated proceedings consumed Onglyza after the discovery cutoff date, and evidence after Plaintiffs' claims accrued is not relevant to a preemption analysis. (*Id.* at 11.)

Plaintiffs challenge to the discovery cutoff date is untimely. The Court addressed this issue after considering briefing and oral argument on the subject in December 2014. (*See* Doc. Nos. 73, 75, 77.) At that time, Defendants argued the Court should limit discovery based on the date of the FDA's assessment of pancreatic safety. In opposition, Plaintiffs argued the February 27, 2014, discovery cutoff date would be a de facto protective order precluding Plaintiffs from discovery into key evidence. (Doc. Nos. 75 at 5; 125 at 25.)

On December 17, 2014, the Court held a telephonic conference on the issue where, following argument by all parties, the Court concluded the date of the Assessment was the appropriate cutoff date for discovery. (*See* Doc. No. 78.) The Court noted the need for a fixed point from which to analyze the data before the FDA and from which to resolve Defendants' affirmative defense of conflict preemption. (*Id.* at 16–17.)

In the context of the present request, Plaintiffs do nothing more than reiterate the points raised in December 2014. The same reasons that the Court cited previously for establishing February 27, 2014, as the discovery cutoff date apply with equal force in the context of the present motion. Additionally, the relevant inquiry for conflict preemption is whether the FDA would have approved a change to product labeling at the time a plaintiff's claims accrued. Whether the FDA would reject a labeling change *now* is less indicative of whether the FDA would have accepted a change at the time a plaintiff was prescribed and consumed Onglyza or Kombiglyze. Notably, all but one Plaintiff consumed Onglyza and or Kombiglyze months or years prior to the February 27, 2014 cutoff date.[19] With respect to these plain-

---

19. The dates of usage for Plaintiffs in this litigation are as follows: Plaintiff Seufert, (Case No. 13cv2169), consumed Onglyza from April 30, 2010 through June 13, 2012, and was diagnosed with pancreatic cancer on September 9, 2011. (Doc. No. 1 ¶¶ 82, 83.) Plaintiff Lara, (Case No. 13cv2928), consumed Onglyza from December 18, 2009 through November 2011, and was diagnosed with pancreatic cancer on December 7, 2011. (Doc. No. 1. ¶¶ 107, 108.) Plaintiff McDaniel, (Case No. 13cv3191), consumed Onglyza from May 25, 2010 through June 2010, and was diagnosed with pancreatic cancer on January 28, 2011. (Doc. No. 1 ¶¶ 99, 100.) Plaintiff

Gaines, (Case No. 14cv0056), consumed Onglyza from June 30, 2010 through November 2010, and was diagnosed with pancreatic cancer on January 24, 2011. (Doc. No. 1 ¶¶ 97, 98.) Plaintiff Marble, (Case No. 14cv0611), consumed Onglyza from November 24, 2009 through March 2012, and was diagnosed with pancreatic cancer on February 28, 2012. (Doc. No. 1 ¶¶ 97, 98.) Plaintiff Stoval, (Case No. 14cv1612), consumed Onglyza from November 28, 2011 through May 2013, and was diagnosed with pancreatic cancer on July 8, 2013. (Doc. No. 1 ¶¶ 107, 108.) Plaintiff Heindl, (Case No. 14cv1973), consumed Ong-

tiffs, the Court must consider whether the FDA would have rejected a label change at any point from 2010 through 2013 based on Plaintiffs' dates of usage. In light of the FDA's February 2014 conclusion that evidence of a causal association was indeterminate, it is clear that the FDA would have rejected a labeling change any time prior. Thus, data available after Plaintiffs' dates of usage would not be relevant in determining whether the FDA would have rejected a labeling change at the time Plaintiffs' claims accrued.

Similarly, the plaintiff that consumed Onglyza after the February 27, 2014, discovery cutoff date did so from August 12, 2014, through September 2014. (*See* Case No. 15cv2190, Doc. No. 1 ¶ 96.) Given the proximity to the date of the Assessment, and the evidence in the record that extends beyond the cutoff date, clear evidence remains that the FDA would have rejected a pancreatic cancer labeling change had one been submitted in August or September of 2014. In September 2014, the FDA was actively reviewing the safety and efficacy of Saxenda, which included

data specific to pancreatic cancer. At that time, the FDA relied on its review underlying the Assessment to reiterate that pancreatic cancer had not been proven as a risk associated with incretin mimetics and that data did not support pancreatic cancer as an incretin mimetic-mediated event. (*See* Doc. No. 119-4 at 103.) Thus, the relevance of new safety information arising between February 2014 and September 2014 is also limited because available evidence provides insight to the FDA's position regarding pancreatic cancer risk. For these reasons, the Court declines to reconsider the propriety of the February 27, 2014, discovery cutoff date.

In further support of additional discovery, Plaintiffs argue *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), does not preclude obtaining evidence in support of preemption and liability arguments.[20] (Doc. No. 125 at 26.) Plaintiffs cite authority holding that *Buckman* preempts fraud-on-the-agency claims, but does not preclude discovery of evidence establishing misrepresentation to federal agencies. (*Id.*)

---

lyza from September 15, 2010 through May 2012, and was diagnosed with pancreatic cancer on January 17, 2011. (Doc. No. 1 ¶¶ 103, 104.) Plaintiff Blazer, (Case No. 15cv1149), consumed Onglyza from February 14, 2011 through March 2011, and was diagnosed with pancreatic cancer on May 24, 2013. (Doc. No. 1 ¶¶ 101, 102.) Plaintiff Gibson, (Case No. 15cv1340), consumed Onglyza from April 2012 through May 2013, and was diagnosed with pancreatic cancer in August 2013. (Doc. No. 1 ¶¶ 104, 106.) Plaintiff Deihl, (Case No. 15cv1435), consumed Onglyza from June 11, 2011 through September 2011, and was diagnosed with pancreatic cancer on November 5, 2011. (Doc. No. 1 ¶¶ 104, 105.) Plaintiff Copeland, (Case No. 15cv1884), consumed Onglyza from May 5, 2010 through February 16, 2012. Plaintiff Copeland consumed Kombiglyze from April 10, 2012 through January 10, 2013, and was diagnosed with pancreatic cancer on January 21, 2013. (Doc. No. 1 ¶¶ 93, 94.) Plaintiff Matthews, (Case No. 15cv2190), consumed Onglyza from August 12, 2014

through September 2014, and was diagnosed with pancreatic cancer on October 1, 2014. (Doc. No. 1 ¶¶ 96, 97.) Plaintiff Elosegui, (Case No. 15cv198), consumed Kombiglyze from July 2012 through October 2012, and was diagnosed with pancreatic cancer on February 4, 2013. (Doc. No. 1 ¶¶ 110, 111.)

**20.** In MDL 2452, the Court declined to compel discovery from Defendants on the grounds that the information sought would establish that Defendants withheld or misrepresented pancreatic cancer data to the FDA. (*See* Case No. 13md2452, Doc. No. 705.) Relying on the reasoning set forth in *Buckman v. Plaintiffs' Legal Committee*, the Court concluded that fraud-on-the-FDA claims were preempted when not asserted as an element of a parallel state tort law duty. Although the Court did not issue that order in this case, this case has mirrored the MDL proceedings, and thus Plaintiffs' argument regarding the applicability of *Buckman* appropriately raised here.

(citing *In re Celexa & Lexapro Mktg. & Sales Practices Litigation*, 779 F.3d 34, 41 (1st Cir.2015); *In re Yasmin and Yaz*, Case No. 9md02100, 2011 WL 6302287, at \*11 (S.D.Ill.2011).)

Both cases cited by Plaintiffs are distinguishable, as they do not address *Buckman*'s relevance to a clear evidence analysis under *Levine*. *In re Yasmin* involved a challenge to an expert's testimony about when a manufacturer provided information to the FDA. 2011 WL 6302287 at \*2. Finding the expert's testimony admissible under *Daubert*, the court concluded *Buckman* did not apply. *Id.* at \*11. The court did not discuss the clear evidence analysis set forth in *Levine*, or explain how evidence regarding compliance or noncompliance with FDA regulations would alter an inquiry into whether a plaintiff's failure-to-warn claims are conflict preempted. *See id.* at \*1 (noting the plaintiffs' claimed the manufacturer misrepresented information pertaining the safety and efficacy of Yaz and Yazmin).

Similarly, in *In re: Gen. Motors LLC Ignition Switch Litigation*, the court considered a motion in limine to exclude evidence that the defendant had intentionally misled or concealed information from a federal agency. Case No. 14md2543, 2015 WL 8130449, at \*1 (S.D.N.Y. December 3, 2015). Finding the evidence admissible despite *Buckman*, the court noted the evidence was not being used to create liability for misstatements to a federal agency, but instead making evidentiary use of alleged misstatements to establish traditional state tort claims. *Id.* at \*2; *see also In re Celexa & Lexapro Marketing*, 779 F.3d at 41 (noting that a state law duty to initiate a labeling change is not a second guess of FDA judgment).

In this case, however, Plaintiffs assert that misrepresented or withheld data is relevant to overcome preemption and undermine the FDA's publicly expressed conclusions regarding pancreatic cancer. This Court has recognized that Ninth Circuit authority similarly holds that *Buckman* does not preempt state law claims that parallel a duty to disclose information to a federal agency. *See Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1226 (9th Cir.2013) ("The central question in this appeal is whether the MDA preempts a state-law claim in which the state-law duty of care 'parallels' a federal-law duty imposed by the MDA. We conclude that such a state-law claim is not preempted[.]"). As raised in the instant context, as a defense to Defendants' proffered clear evidence, Plaintiffs are not using alleged misrepresentations to establish parallel state law duties to disclose information to the FDA. Accordingly, *Buckman* does not permit discovery on the grounds that information withheld from the FDA can rebut a finding of clear evidence. To hold otherwise would allow a plaintiff to cite any data, presumably unconsidered by the FDA, to overcome a conflict preemption defense. Although the burden imposed on a conflict preemption proponent is high, the Court is unconvinced it requires a defendant to establish the FDA has considered all available data before rendering its conclusion regarding product labeling. For these reasons, authorizing additional discovery premised on allegations that Defendants withheld or misrepresented data to the FDA is not appropriate. Plaintiffs' request for additional discovery is denied.

## V. CONCLUSION

The unprecedented facts of this matter demonstrate by clear evidence that the FDA would have rejected a pancreatic cancer labeling change if submitted by Defendants. The FDA's repeated review of pancreatic safety, coupled with its consistent conclusion that product labeling adequately reflected the state of scientific data presents facts distinguishable from

the majority of conflict preemption case law. Accordingly, Defendants' motion for summary judgment is **GRANTED**. Plaintiffs' request for additional discovery is **DENIED**. The Clerk of Court is instructed to enter judgment in the above and related cases in favor of Defendants and against Plaintiffs.

**IT IS SO ORDERED.**